v. San Francisco. Thank you, Your Honor. May it please the Court, my name is Martin Feinman and I'm with Davis Wright Tremaine LLP on behalf of the plaintiff, appellant and cross-appellee MetroPCS, Inc. With the Court's permission, I would like to reserve approximately three minutes for rebuttal. You'll have to help keep track of your time, but you may have it. Thank you. The Telecommunications Act sets up a regulatory scheme for wireless services. The underlying goals of that regulatory scheme are to preserve and to foster competition amongst carriers and to encourage the rapid rollout and deployment and expansion of wireless service to consumers. To further those ends, the Telecommunications Act has the following features. First, it gives the FCC the authority to regulate the number of wireless carriers in any given market in order to efficiently utilize the available spectrum. Secondly, it restricts local zoning bodies' authorities to regulate the placement and construction of wireless equipment and wireless facilities, and it does so in a number of ways. It prohibits discrimination between the providers of functionally equivalent services. It prohibits actions that would prohibit or effectively prohibit the provision of wireless services, and it also prohibits regulation based on radiofrequency emission concerns. Furthermore, localities are prevented from using pretextual reasons to regulate in a manner that's forbidden by the Act, and the way that the Telecommunications Act accomplishes that end is its requirement of a written decision that is supported by substantial evidence in the record. Now, against that background, against that regulatory scheme, the City claims that it is able to deny a permit to my client, to Metro PCS, a wireless carrier that's licensed by the FCC to provide wireless service in the City of San Francisco on the basis of the City's view that an additional wireless server, either in the City of San Francisco or in the neighborhood where the equipment would be installed, is, in the City's view, unnecessary or redundant. The regulatory scheme... In this case, we're not confronting the former. It's only the latter. San Francisco has not excluded Metro PCS from the San Francisco Bay Area, correct? No, I would disagree with that, Your Honor. The record is somewhat ambiguous on that point. The City's denial motion actually speaks both to a standard of lack of necessity both in the City as well as in the neighborhood, and in a number of places it talks about a supposed lack of necessity in each of those. It is true that there were some wireless facilities that Metro PCS has been able to install because either they didn't require a conditional use permit or they did and that was not challenged. That is a far insufficient number for the Metro PCS to complete its network, but... Well, let me stop you there, too. What is it that you are required to be allowed to do to complete the network or what is... I'm struggling for even the right question. How big a gap is too big a gap as a matter of law? In other words, you're not entitled to perfect coverage. You can't say, well, you know, we want to have the best of the best and we're going to have one of these every three blocks. The City's entitled to say, no, that's too much, but we're at the margins. Is it not enough and how do we decide that? Right. The answer is that we're not entitled to have a system that is absolutely perfect and has no dead spots whatsoever. On the other hand, we are entitled to a complete system which is described in the cases and in the FCC regulations as seamless and ubiquitous coverage. What we have presented before us here is far from that seamless coverage that would be required. The record indicates that in order for Metro PCS to have an adequate system, it needs 50 sites within the city. The record shows that Metro PCS was only allowed to erect 30 and further that it was denied not only on the Geary Boulevard occasion, but on at least two other occasions. You're making a rather sweeping preemption claim here or preemption argument. Isn't it the intent of Congress here by including the prohibition requirements and also the discrimination requirements, isn't that an attempt to reconcile a Federal purposes with the local interest in zoning? Yes, Your Honor, that's exactly correct. Is there some preemption claim going beyond those two provisions in the Act? Well, I think there are at least three provisions in the Act, Your Honor. One is Section 253. A second is Section 332C3A. You'll have to tell me what those provisions indicate. Certainly. In each case, it requires that the states or localities not interfere with the Federal scheme. Section 253, which has been cited in the briefs, is entitled, in fact, Removal of Barriers to Entry. That's the very title of the section. And it begins by saying that no state or local statute or regulation or other state or local legal requirement may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service. And the other one that I asked you about, prohibition. That's Section 253A. Discrimination is the other one that seemed to me to be to fit in with the preemption concern. How do you reconcile the Federal requirements with the local? Yes, that's correct. Those two are attempts to do that. Just to make sure that we do have them all in front of us, there's also Section 332C3A, which states and it is entitled State Preemption. And it indicates in part, no state or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph should not prohibit a state from regulating the other terms and conditions of commercial mobile service. And the other section that you haven't mentioned that seems to me to be quite central to our thinking is 332C7B, which is Exactly. It says, zoning is still okay, except, and then it lists some exceptions. So the Congress at least thinks that zoning is still okay, with some narrow exceptions. That's right. Zoning is okay, with some very important exceptions, and those include the no discrimination and no prohibition and no RF emissions, and that any legitimate zoning concerns are based on a written denial that's supported by substantial evidence in the record. Now, it is an attempt to balance those two. Legitimate, or I think the cases sometimes call it traditional zoning concerns can be accommodated. Those are things like making sure that the equipment itself is painted a color that's compatible with the surroundings. Well, certainly one of the reasons given here is visual blight. That is definitely one of the reasons. That's correct, Your Honor. I would point out I know you argue that's not supported by the evidence, but is that a legally permissible reason in your view? Visual blight can be, although interestingly enough I'm not aware of any case, it comes up in numerous cases and to my knowledge in every case is found not to be supported by substantial evidence or to otherwise not be permissible because there's RF concerns or discrimination or prohibition concerns present as well. But visual blight at least conceptually could be a legitimate zoning concern. Now, as you correctly recognize, we argue that here, as in all those other cases, it is not supported by substantial evidence in the record. What if it were? What if these panels, in a number of the cases of the towers, which are pretty dramatic, this is panels on top of a light standard on top of a parking structure. But let's suppose that under review standards, we would have to conclude that the visual blight aspect was a, was supported by substantial evidence. Is that the end of the day for your client? Oh, no. By no means, Your Honor. What's the counterbalance, if any, to that? Well, first of all, the visual blight would have to be supported by substantial evidence. I'm assuming that it is. Take my hypothetical. Right. And I don't say that blithely because what the cases say is generalized complaints about aesthetics don't I'm just trying to understand whether the anti-discrimination or exclusion provisos override a finding of a legitimate zoning. Oh, absolutely. Absolutely. It is a flat-out prohibition in the statute of discrimination Well, it's not a general ban. Just let's suppose that your case comes down to whether it turns out that you've got a significant gap in your coverage and they've got a concern about visual blight. Right. Who wins in that? In that case Be supported by substantial evidence. Actually, substantial evidence doesn't even come into the picture in connection with the discrimination or Well, then let's just assume that the visual blight is supported by. Right. Does that defeat your discrimination claim? No, it does not, Your Honor. The visual blight, then what we'd have is we'd have a denial motion by the city that was supported by or presumably supported by two reasons. One, perhaps allowable under the statute. The other, flatly prohibited by the statute. The denial cannot rest on a ground that the statute prohibits. And cases so hold, including, interestingly enough, the Hocus case that Mr. Sanders in the city cites so frequently. It's exactly that circumstance. There are several cases that fall into that pattern, and they all hold that if there's a permissible ground and an impermissible ground, then the denial motion is improper. Let's see. Perhaps I could return to Judge Cudahy's question. The statute does attempt to do a balancing between the federal interest versus the state and local interest in terms of zoning. And it does so in the manner in which I've described in terms of the statute, strictly circumscribing the areas in which the states and localities can operate in terms of what they can regulate. And what we know is that one area in which they cannot regulate and which was the principal basis for the denial in this case, namely they cannot deny on the basis that the city views that there are enough carriers already serving that locality. We've discussed in our briefs. That can be dealt with under the prohibition requirement of the statute, can't it? That's right, Your Honor, and also- Depending on how you construe the prohibition. That's right. Actually, there are several cases in which cities have attempted to deny permits for wireless facilities based on their view that we have enough carriers, another carrier would be unnecessary or redundant. And some of those cases- Suppose you have a so-called first circuit rule on this which talks about a significant gap in your own system. Right. Rather than looking at the system as a whole. Doesn't that deal with your preemption point on necessity? Just to be sure that we're on the same wavelength, Your Honor, if I can use that term here. First of all, the cases that have treated the issue of whether necessity can be a ground for denying a wireless permit, they've all said that they cannot. They've done so not only on the prohibition ground that Your Honor has referred to, but several of them also ground it on the discrimination ground, just to explain that. Either one or the other, yeah. Exactly. Either and, in fact, both. It's a pretty blatant rank discrimination against the new market entrant and in favor of the incumbent carriers. There couldn't be a more clear case of discrimination between functionally equivalent carriers. Again, you're taking kind of a broad sweeping principle, but just per se that the last entrant is disadvantaged or discriminated against. That's right, Your Honor. And any particular showing in any particular instance? Well, I think we have an instance in the case that's before Your Honor. What the denial motion is grounded on is the notion by the city that we already have five carriers. We don't need another one. And that is an impermissible ground under the statute. It is the FCC that gets to determine how many carriers are sufficient for San Francisco. Doesn't the First Circuit in dealing with the prohibition requirement, doesn't their rule address that very question? This is under the prohibition analysis, specifically under the effective prohibition through a significant gap. And there is a split in the circuits that's been discussed by the parties. I'm talking about the First Circuit rule. Yes, and the First Circuit adopts the so-called any provider rule. The nomenclature actually is somewhat confusing. So just to be clear, there is a minority rule that the city is arguing for that the district court below rejected, and the majority of courts reject, including the majority of circuit courts reject. And that is the so-called one provider rule. Under that rule, there's not a significant gap for Metro PCS, let's say, if AT&T Wireless serves that area. The standard that the majority of courts take, as well as the district court here takes, is the so-called any provider rule, which means that Metro PCS is entitled to build out its system. And if by denying a permit for this facility, it would create a significant gap for Metro PCS, then there is a significant gap and, therefore, can be an effective prohibition of service. As the board here looked at the necessity of service within the Richmond district, that measures and there's language in some of these opinions about remote user. So I'm trying to understand if we're looking to see from a consumer side of the issue, do we look to the consumers within the affected neighborhood? Do we look to the entirety of San Francisco on the theory that there are people driving through Richmond who don't want falloff? And if so, who is the remote user that's being referred to in these opinions that are talking about looking to the remote user? Right, Your Honor, precisely. It's not simply judged from the point of view of the people who live in the immediate vicinity of the facility. Otherwise, we're not going to have what the FCC requires, which is seamless and ubiquitous service. We're going to have a significant gap. And it does no good to say you can get service from Metro PCS in the Marina district or the Sunset district, but you cannot in the Richmond district because the city feels that it's unnecessary. It's not judged by the immediate residents. The purpose of mobile communications is because people are mobile and drive through the Richmond district. One of the, I think, excellent points that was made was that one of the principal benefits of mobile communications is for emergency purposes. It does you very little good to have a cell phone in case your car malfunctions and to have it break down in front of the Geary Street parking garage, and there you cannot get service. And there's little comfort that you can get Sprint service there. You're using your rebuttal time, which you're entitled to do, but I thought I'd point that out. With the Court's permission, I'll reserve the remainder of my time. I just want to ask one question on our time because we posed it in our order, and that is whether or not the parties think Verizon or the Metronet decisions have any relationship to this case. And to sharpen the focus a little bit, one of the options suggested is inter-carrier agreements and whether in any respect either of those opinions has any relevance to this case. There's an old joke amongst lawyers that the- And I won't be offended if you say no. That was what I was going to get at. The old joke is that the only motion that's always granted is a sua sponte motion. So when the order said, what is the relevance if any of these cases, one feels a little bit required to say that it's relevant. Quite frankly- I felt so inclined. That wasn't the intent of the order. It was clarification. Quite frankly, Your Honor, I don't believe that it applies. Those two cases dealt with a provision of the FCC Act, Section 251. In 251, the structure of Section A has to do with any carrier. Section B has to do with what are called LECs, local exchange carriers, and Section 3 has to do with incumbent local exchange carriers, sometimes called ILECs. Wireless carriers are not local exchange carriers, nor are they incumbent local exchange carriers. So there is no right to interconnect. It's easy to sort of get confused in the nomenclature. With local exchange carriers, there is this beast called interconnection agreements to connect into that exchange. What was talked about in the record here was the suggestion that perhaps there could be an inter-carrier arrangement, without any proof or showing that that was possible. And, in fact, the testimony was that it would not be possible. Inter-carrier is just a fancy word for roaming. Sometimes you might travel to Chicago and you have a MetroPCS phone, and MetroPCS isn't in Chicago, there might be the possibility to roam. I'm sure that's terminology you've heard. Thank you, Your Honor. Thank you. Thank you. Mr. Sanders. Good morning. William Sanders, Deputy City Attorney for the City and County of San Francisco. You've just heard MetroPCS argue that this case is about the FCC's authority to license spectrum and regulate entry of wireless carriers. Nothing could be further from the truth. This case is before this court because the court certified for appeal the district court's order on summary judgment with respect to one of MetroPCS's claims. That was its claim under Section 332C-7 of the Communications Act. That is the only claim before this court now. MetroPCS's argument about Section 253 and Section 232C-3 are alleged in their complaint, but those claims were bifurcated at the district court level, were not the subject of the summary judgment motion that was decided by the district court, and were not certified for appeal. So at some point, those claims might be heard here, but they're not legitimately before this court at this time. When Congress enacted the Telecommunications Act ---- But what is your formulation of what you think we are authorized to decide about? You're deciding the claim under Section 332C-7, which really involves four components. Number one, which is the preservation of local zoning authority statute, which is at issue here. And there are four components to that claim that are at issue here. The first is the substantial evidence component. The second is the unreasonable discrimination component. The third is the effective prohibition or the prohibition component. And the fourth is the radio frequency preemption component. Well, if I ---- I mean, speaking only for myself, I understand opposing counsel's arguments to be interpreting items two and three in your list by looking at other parts of the statute and by looking at cases interpreting those other parts of the statute. I guess I didn't understand them to be expanding their claim so much as trying to explicate it. I think it does, Your Honor, because if you look at Section 332C-7, the section that is applicable here, it says nothing in this act shall limit local zoning authority except as provided herein. So if you're starting to look at what other sections of the Communications Act say about the FCC's license authority, you're taking away the limited nature of the preemption that's available here. This statute, the purpose of this statute, the overriding purpose was to preserve local zoning authority with specific limitations on that authority. Let me ask you a question about the discrimination prong. And I just want you to assume the things that I'm going to say, and I know you may or may not agree with them factually, but let's assume that another carrier has what opposing counsel refers to as seamless and ubiquitous service throughout the city and in particular in the neighborhood where the Geary parking garage is. And then let's assume that Metro PCS has service that is noticeably inferior in some way because of a geographical glitch or gap. Is that discrimination? And if not, why not? No, it isn't, Your Honor. And I think if you look at what the circuit courts have done with discrimination claims, first of all, discrimination must be unreasonable. So the first thing the courts look at is what was the basis for the local government's decision in the first place. Was that decision based on substantial evidence? The courts have said that how can a decision based on substantial evidence in the written record applying local zoning laws be unreasonably discriminatory? That's what the Willis Court said in the Second Circuit, and the Fourth Circuit said that in the AT&T Wireless case. So your view is if, let's say, going back to my example of visual blight, if there is visual blight from a particular proposal, then even if that results in discrimination in the sense of better service with one carrier than another, too bad for the carrier unless they can come up with something that doesn't have visual blight involved in it. Is that basically your position? I think that's fair to say because any other view of the statute makes the unreasonable discrimination part preempt the substantial evidence component of the statute and weights the balance of this approach that Congress envisioned of the preservation of local zoning being paramount and the protection of the carriers being secondary and reverses it and makes the mere fact that one carrier has ubiquitous, seamless coverage in the city of San Francisco discrimination if the city, which has issued 30 permits to MetroPCS. MetroPCS is providing service in the city. They tell their customers they have excellent service in the city. But let's assume for now that, well, of course they're going to tell their customers that. They're not foolish. But let's suppose that they need 20 more, as they've said, and let's suppose there's evidence to support that. Your position is that those 20 still have to be located in a place and in a manner that's consistent with the city's zoning. Is that a fair summary of yours? That's fair to say. That's what the statute says. Preservation of local zoning authority is paramount. So when the city, the Board of Supervisors used the necessity standard here, necessity for the community. The Board was using a standard it has used for a long time with respect to any conditional use, be it another fast food restaurant, another gas station, or another wireless carry. There's a big problem with that, isn't there, under this Act? Because this Act isn't about stand-alone operations. It's about a network, which the First Circuit addresses in its opinion, which is to say you don't have a wireless service, which is a mobile service, by applying neighborhood-specific criteria, which will create big holes in a service provider's network, right? Do you do agree with that? The way the Board looked at it in this case, the Board looked at necessity from two standpoints. First, it looked at necessity from the standpoint of is there adequate coverage in this neighborhood from other carriers? And there the evidence was undisputed. Coverage for whom? For the remote user. And Your Honor asks a question about the remote user. And I think what you're saying. But that's not going to maintain competition, is it, that approach? If you say as long as you've got service from somebody, that's good enough. Well, that's the balance. What happens to the other competitors? That's the balancing approach that Congress envisioned here. And Congress allowed cities to deny permits. Any time a city denies a wireless carrier a permit to construct a facility, the carrier is not going to get better service. The carrier is not putting up a site that it doesn't need. Clearly they want the site. They believe the site will provide their coverage with their customers with better service. But better service, ubiquitous service, seamless service is not the issue here. If Congress wanted that to be the issue, Congress could have simply said, we are preempting local zoning authority. Well, I don't think that's quite right. You were going to answer my remote user. I was. You say they looked at it from two perspectives, even looking at it clearly from the perspective of residents of the neighborhood. They were looking more at just residents of the neighborhood. They were looking at the neighborhood, because the city's planning code says the neighborhood and the community. That would also mean people who don't live in the Geary Corridor there, but come there to shop, drive through on their way to the beach. So I think remote user means people using their telephones in this vicinity. It doesn't just mean the residents. Okay. I'm looking at paragraph one of the board's findings, and assuming these satisfy the written explanation, this is what we've got to go on. It says, no members of the public testified that there was a need for further wireless service in this neighborhood. Many members of the public testified there was no need for further wireless service in the neighborhood. Did not establish, and I'm skipping, did not establish that the proposed site is necessary to meet the community needs. So I'm trying to understand from that, we're supposed to assume that looked at both mobile users and people within the community. Is that correct? That's correct, Your Honor. Who from outside the Richmond area testified that there was no problem in the Richmond District? I can't say that all of the people who testified were residents of the Richmond District. There were people from outside the Richmond District who did testify here. But all of the testimony about coverage in the neighborhood, at least from other carriers, was consistent. And even Metro PCS's own employees and representatives. That's evading, I think, with respect, the question. The issue is, maybe you're right. Maybe all that the act requires is that within a particular neighborhood, as long as there is an adequate number of servers so that they have a choice among not just one monopolist, or functional monopolist, but you can get a number, you get Sprint, Nextel, or whatever, and it's too bad if Metro PCS shows up late. Or it could be that one looks to see whether or not on the competitive, promoting competitive aspects of the TCA, that you look to the overall wireless community, because maybe the community in this case, the relevant geographical market, to borrow antitrust terms, is the market defined by Metro PCS, which is the greater Bay Area. And if they can establish that their customers, once they hit the Richmond district, have serious drop-off in service, is that not a relevant consideration that has to be taken into account? Or not? It's not relevant under the prohibition test if this Court follows the Fourth Circuit general ban test, or the Second and Third Circuit single provider version of the significant gap test. It's only relevant if this Court wants to adopt the approach used in the, used by the First Circuit in the second generation test, which is the approach that's most favorable to the carriers, because it allows the Court to look at the gap from the perspective of each individual carrier. But even if this Court adopts that approach, there's no evidence here to support Metro PCS's claim that it has a significant gap. And that's true for a lot of reasons. First, if you look at the information Metro PCS submitted to the Board of Supervisors, those are maps showing Metro PCS's theoretical coverage in the area. At the time of that hearing before the Board, Metro PCS's service was not available. They couldn't do what other carriers do, which is go around and do a drive test and show exactly where they have coverage and didn't have coverage. And the only testimony about the validity of that test was to say it's an exact tool, without really any explanation of how that tool has worked. Now, we move ahead a year later where we're at the district court. Metro PCS's service is now available. They're providing service here in San Francisco. They have lots of customers. They're telling their customers we have great service here in San Francisco. What evidence does Metro PCS come forward with in the district court to prove that it has a gap? It has testimony from one of its employees who says, we don't have adequate coverage in the Richmond district. No explanation of what adequate means. You heard Mr. Feinman talk about coverage which is seamless and ubiquitous. Well, the planning commission came to the opposite conclusion than what you're describing. And the planning commission's decision is quite detailed and discusses the specifics of the technology and the topography of the city and the intersection of those two and goes on to accept the necessity of 50 locations and actually also to approve this particular project. What effect, if any, are we to give the findings and conclusions of the planning department as distinct from the information taken at the public hearing and the board's later decision? I have two answers to that, Your Honor. First, the board is taking these on de novo review. That's the way these conditional use appeals are done in the city of San Francisco. The second answer is what the planning commission found was that Metro PCS would need and really the planning commission just sort of adopted Metro PCS's claim and said it would need 50 antennas to provide seamless coverage in the city of San Francisco. Now, there is no standard, there's no case that I'm aware of that ever has said that the effective prohibition claim allows you to prove you need seamless coverage. And even if you accept the view that they need 50 antennas, there's nothing which says that this is one of those antennas. They have 30. Where do they need the other 20? We don't know the answer to that question. All we know is what evidence they had here to show that they had a gap in coverage, and that evidence is deficient. The information that went to the planning commission is forwarded to the city, to the board. That's not correct, Judge. That's not correct. Some of that information. You're asserting that the planning commission based its decision on certain things and not on other things, so how do we know that that's true if we don't have that in the record? What we have in the record is the report that you're citing is in the record. The information that the plan --. Okay, but you make a certain claim about what that was based on, but do we know that? Yes, I think if you read what the planning commission said about those 50 sites, it makes clear that they're saying that that's what Metro PCS has said. The planning commission doesn't go out and hire experts to examine these claims. They rely essentially on the statements made by the carriers. I know if you look at some of the cases, some of the local jurisdictions go out and hire independent experts to examine these claims of coverage and lack of coverage. We don't do that in San Francisco. The planning commission didn't do it. The board didn't do it. I'd like to ask a question about unreasonable discrimination. The cases seem to, many of them seem to talk here about discrimination between providers whose facilities are similarly situated in terms of structure, placement, or cumulative impact of facilities. And as I understand, Judge Hamilton here dealt with a discrimination claim by pointing out that nobody else wanted to put an antenna on this particular parking garage. But doesn't similarly situated mean taking into account that the facilities that are a block away or that are in the area? It seems to me that's the only way you could reasonably interpret this kind of language. I think it does, Your Honor. I think you have to look at. I'm not going to restrict it to a case of somebody else puts an antenna on the same place that you want to put it. Therefore, if you don't allow the second carrier to put one there, you're discriminating. It seems to me you've got to take a little bigger picture than that, don't you? The court should look at all those factors. What type of district is this particular antenna in? Is it in a residential district versus a commercial district? What is the nature of the facility being constructed? And how many other facilities are there in the given area? And that's the problem with the evidence in this case. There is no evidence of any similarly situated facilities. The evidence is that the city has. . . It's not a very good reason for giving summary judgment, is it, that we don't have enough evidence on this point? Well, it was Metro PCS's burden to show that the city discriminated against it by treating similarly situated facilities differently. And they didn't meet their burden because they provided no evidence to the court on that issue and is relying essentially on this per se discrimination approach. If you let other people provide service here, you are discriminating against us, regardless of what those facilities look like, why they were permitted, what the situation is, what the carrier showed when it got its permit. They are just saying you let other people in, you don't let us in, that's discrimination. That essentially makes the promise of preservation of local zoning authority illusory because you can't let everyone. . . you can't keep everyone out because then you're going to have a general ban. You let one person in and then you're discriminating against everybody else who tries to come in. The interplay between the effective prohibition and the unreasonable discrimination claims is not well laid out between the cases. Judge Fischer was asking earlier, does a prohibition claim trump a substantial evidence claim to make a bridge analogy? And I think it really depends there on how you look at this balancing test that Congress created in Section 332C7. If you look at what Congress called the statute and what Congress intended to do, which is to preserve local zoning authority, you have to say that if this decision is supported by substantial evidence, it stands, unless really there is a banning all carriers from providing service or unreasonably discriminating, which I think as Judge Cuddy, he said, would involve a comparison of similar situated facilities and circumstances. None of that, one of which we have in the record here. Counsel, I was looking and maybe in vain for a photograph or rendering or drawing of what the proposal would look like, since one of the up front and center reasons is visual blight. That's one of the stated reasons. And where was I? There is a photo. Where did I miss it? There is a photo of the facility, Your Honor. Ah. Judge Fischer has found it. Before and after. Before and after. Okay. Thank you. He's a better finder than I am. Who put that evidence in? That evidence was in the record before the planning commission. It was in the record before the board, and it was in the record before the district court. So it's been in the record from the start of this case. It's always been an issue. What it looks like. As having put that evidence in the record then? You said they hadn't put any evidence in of discrimination, but we have some evidence apparently that's related to that. But there's no evidence what other sites in this facility look like and why those sites were granted, why this one was denied. That's the type of evidence that's necessary to show an unreasonable discrimination claim. And I see my time is up. I would just sum up by saying that the district court got it right with respect to the substantial evidence, unreasonable discrimination, and RF claims here, and the court should affirm that decision. District court got it wrong when it relied on the second circuit, the first circuit. Second generation. The second generation test. Excuse me, Your Honor. Third time you said it. Third time the charm. And the court should be reversed in that area and summary judgment granted for the city. Thank you. Thank you, Mr. Simmons. You have some rebuttal time remaining, Mr. Feinberg. Thank you. I would like to just respond to a few of the things that Mr. Sanders discussed or were asked about. Did you put in any evidence of discrimination there? He said you didn't. Did you? Certainly we did, Your Honor. One element of that is what we were just looking at, and it's photo simulations of what the site would actually look like. It's excerpt of Record 31, Exhibit 1. And I think it's important. The district court looked at this. The planning commission looked at this, and it's now been brought up here. These facilities that are at issue are virtually invisible. If I didn't, if my client didn't put an arrow pointing to where they are, I dare say the court and the public would not even be able to see them. It is, I think, plenty of evidence that my client is being treated differently than every other carrier. I think he concedes that you put that one in. What about what do the others look like, sprints and everybody else's look like? Right. Photos of those are not in the record. I do concede that. And can I ask you another evidence question? Where is there any evidence other than from residents in the Richmond district? Did you put forward any evidence from anyone, or could you at any time, put in evidence to show that you had your customers who were experiencing fall off in use once they got into the Richmond district? Yes, Your Honor. What was in the record before the planning commission, with the planning staff, with the Board of Supervisors all throughout, was extensive radio frequency engineering evidence of exactly that issue, that this site was necessary. I think something that's important on this issue is to not lose sight of the district court's ruling on the point. I think Mr. Sanders perhaps inadvertently misstated what the record is. I would direct your attention to page six of the district court's opinion, footnote six, which says, and I'll just read the last sentence of it, but it provides a fair amount of explanation. Without it further showing, the record does not appear to support the board's decision that Metro PCS did not need the installation. So it was unproven, and there is not substantial evidence of what the community, what Mr. Sanders is suggesting the community was arguing for. My time is about out. If I could just maybe leave with one closing thought, it would be as follows. I think it is quite interesting that we have quite a few of the other wireless carriers that entered into this case as amicus, all in support of Metro PCS's position. Arguably, those are our competitors who would be advantaged by the city's decision and by the district court's decision. To the contrary, they understand that this is a dangerous decision that the city has made and that the district court has allowed to stand. It has widespread ramifications, not only for this one site, not only for Metro PCS in San Francisco, but for all wireless carriers in terms of a violation, a rank violation, of the federal system for regulating wireless carriers that's been established by the Telecommunications Act. Thank you. Thank you, counsel. We appreciate very much the arguments of both parties. They've been quite interesting. And this case will be submitted. And we appreciate that no cell phones went off during the argument. Yes. We shut off their antenna. The final argument.
judges: Cudahy (7th Cir.) Graber, Fisher